UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>RATHNAKISHORE GIRI,<br><br>Defendant. | CASE No. _____<br>2:22-cr-223<br><br>JUDGE Marbley<br><br>INDICTMENT<br><br>18 U.S.C. § 1343<br>18 U.S.C. § 981(a)(1)(C)<br>28 U.S.C. § 2461(c) |

FILED
RICHARD W. NAGEL
CLERK OF COURT
2022 NOV 17 PM 12: 34
U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

**THE GRAND JURY CHARGES:**

<u>INTRODUCTORY ALLEGATIONS</u>

At times relevant to this Indictment:

1.  Defendant RATHNAKISHORE GIRI resided in the Southern District of Ohio.

2.  NBD Eidetic Capital LLC ("NBD Eidetic Capital") was organized under Ohio law in or around October 2020. Defendant GIRI was the CEO and founding member of NBD Eidetic Capital. A bank account in the name of NBD Eidetic Capital was held at Bank A ("NBD EIDETIC CAPITAL ACCOUNT").

3.  SR Private Equity LLC ("SR Private Equity") was organized under Ohio law in or around April 2021. Defendant GIRI was the co-founder and CEO of SR Private Equity. A bank account in the name of SR Private Equity was held at Bank A ("PRIVATE EQUITY ACCOUNT").

4.  The term "cryptocurrency" generally referred to an asset issued and/or transferred using distributed ledger or blockchain technology.

5. "Bitcoin" was a type of cryptocurrency. Bitcoin were generated and controlled automatically through computer software operating via a decentralized "peer-to-peer" network. Bitcoin could be used for purchases or exchanged for other currency on currency exchanges. Certain platforms permitted the trading of Bitcoin futures and derivative contracts.

## THE SCHEME TO DEFRAUD

6. Beginning no later than in or around August 2020 and continuing until at least in or around July 2022 (the "Relevant Period"), in the Southern District of Ohio and elsewhere, defendant GIRI, both directly and through corporate entities NBD Eidetic Capital and SR Private Equity, fraudulently obtained funds from prospective cryptocurrency investors. Defendant GIRI solicited such investments through false representations and under the false pretense that he had a successful track record as a cryptocurrency trader and investment manager, and that he would invest the investors' funds in cryptocurrency, guarantee the investors' principal investment amounts in full, and provide lucrative rates of return.

7. In reality, as defendant GIRI knew, he had a history of failing to fulfill such promises to investors. Among other things, defendant GIRI repeatedly failed to repay investors' principal investments, having taken no steps to protect such principal. Moreover, defendant GIRI repeatedly failed to provide investors with their promised rates of return. At times, defendant GIRI never even transferred certain investor funds to any cryptocurrency platform for investment; instead, he diverted those funds for his personal benefit and/or to repay earlier investors — a hallmark of an unlawful Ponzi scheme. As a result of defendant GIRI's false representations and pretenses, defendant GIRI raised over $10 million from investors as part of his scheme.

8. In furtherance of his scheme, defendant GIRI made materially false and misleading statements and omissions to investors, including, but not limited to:

2

a. statements representing that he was a successful cryptocurrency investor and investment manager;

b. statements guaranteeing investors that their principal investment amounts were secure and would be repaid in full;

c. statements regarding the high-yield returns that would be generated through defendant GIRI's investment strategies;

d. statements regarding the use of invested funds, including misrepresentations that all funds would be invested in cryptocurrency for the benefit of the investors, as well as omissions regarding the fact that a portion of investors' funds would be used to personally enrich defendant GIRI;

e. statements to existing investors who had not been repaid their principal investment to induce such investors to delay their efforts to withdraw their investments and/or to invest additional funds; and

f. statements to prospective investors omitting defendant GIRI's long history of investment losses, including lost investor principal.

## PURPOSE OF THE SCHEME TO DEFRAUD

9. The purpose of the scheme was for defendant GIRI to unjustly enrich himself by fraudulently obtaining money and property from investors.

## MANNER AND MEANS OF SCHEME TO DEFRAUD

### Defendant GIRI Solicits Investors Using Material Misrepresentations

10. Defendant GIRI falsely held himself out to prospective investors as a highly successful cryptocurrency trader who specialized in Bitcoin investments, including Bitcoin-related derivative products, and touted his ability to earn lucrative returns using complex trading

3

strategies, including, but not limited to, leveraged trading and the use of "bots" to execute trades. During the Relevant Period, defendant GIRI solicited investments from numerous individuals, many of whom lived in the broader Columbus, Ohio area, through in-person meetings, telephone calls, text messages, and online communication platforms, among others.

11. To lure investors, defendant GIRI created the appearance of success by boasting about his own personal wealth and lavish lifestyle. For example, defendant GIRI drove luxury cars, including two Lamborghinis, a Tesla, and an Audi R8, wore high-end watches costing hundreds of thousands of dollars, flew on private jets, and rented luxury vacation homes.

12. Defendant GIRI falsely represented to investors that their investments were risk-free because they were guaranteed to recoup their investment principal, along with high-yield returns, within a specified period (typically between 30 and 120 days). In addition, Defendant GIRI often falsely represented to investors that they could receive their investment principal and accrued interest anytime upon demand and reasonable notice after the specified period expired. To make investors feel secure in their investments, defendant GIRI often provided, or caused SR Private Equity or NBD Eidetic Capital to provide, written promissory notes.

13. The investment amounts received by defendant GIRI typically ranged from $2,000 to over $300,000 per investment, though some individual investors invested more than $2,000,000 with defendant GIRI across several investments.

14. Instead of using all investor funds for cryptocurrency investments, as promised, defendant GIRI diverted certain investor funds to other purposes, such as payment of his own personal expenses or repayment of principal or interest on earlier investments in a manner consistent with a Ponzi scheme.

15. To attract new investors and to encourage existing investors to "roll over" or reinvest existing investment amounts and any purported returns, defendant GIRI provided misleading information that purported to show the profitability and success of his current investment portfolio.

### Defendant GIRI's Early Investment Failures

16. In or around August 2020, defendant GIRI offered INVESTOR-1 an opportunity to invest in a purported "friends and family" fund managed by defendant GIRI. Defendant GIRI falsely represented that he would double INVESTOR-1's money in six months by investing in cryptocurrency. On the basis of these representations, on or about August 11, 2020, INVESTOR-1 sent an electronic bank transfer of $80,000 to defendant GIRI's personal bank account at Bank B bearing an account number ending in X2733 (the "GIRI PERSONAL ACCOUNT"). Later the same day, instead of using INVESTOR-1's money solely to invest in cryptocurrency, as defendant GIRI had represented, defendant GIRI converted the investment into Bitcoin and transferred approximately 1.49 Bitcoin (approximately $16,913 as of that date) to the cryptocurrency exchange wallet of an earlier investor. With the exception of an approximate $10,600 payment made to INVESTOR-1 on or about September 15, 2020, defendant GIRI did not repay INVESTOR-1 his principal or any interest, despite INVESTOR-1 requesting repayment of such funds.

17. Between on or about September 29, 2020, and on or about October 6, 2020, defendant GIRI received approximately $260,000 in investor funds into the GIRI PERSONAL ACCOUNT, including approximately $130,000 from INVESTOR-2, who provided the funds based on defendant GIRI's false representation that defendant GIRI would use the funds solely for the purpose of investing in cryptocurrency. Defendant GIRI failed to invest the entirety of the

$260,000 in cryptocurrency. On or about October 6, 2020, defendant GIRI withdrew $622,000 from the GIRI PERSONAL ACCOUNT and used it to purchase a Lamborghini. Defendant GIRI did not repay INVESTOR-2's principal or any interest, despite INVESTOR-2 requesting repayment of such funds.

18. In or around October 2020, defendant GIRI offered INVESTOR-3 an investment opportunity and falsely represented that INVESTOR-3's principal was guaranteed. On the basis of this representation, on or about October 22, 2020, INVESTOR-3 transferred 1.588 Bitcoin (approximately $20,451 as of that date) to defendant GIRI and sent an electronic bank transfer of $30,000 to the GIRI PERSONAL ACCOUNT for the purpose of investment. Defendant GIRI did not repay INVESTOR-3's principal or any interest, despite INVESTOR-3 requesting repayment of such funds.

### Defendant GIRI Opens an Investment Fund

19. In or around October 2020, defendant GIRI formed NBD Eidetic Capital as an investment company and began to solicit investors for an investment fund. Defendant GIRI falsely represented to prospective fund investors that he was a successful cryptocurrency trader who was able to deliver lucrative investment returns for investors.

20. Between in or around October 2020 and January 2021, defendant GIRI raised approximately $3,007,250 from approximately 38 investors in NBD Eidetic Capital, based on the guaranteed return of the investors' principal investments and a five percent monthly return (referred to as a "dividend"). According to the investment agreement, all investors were to be repaid their principal at the expiration of a four-month term ending on or about May 14, 2021, and defendant GIRI was required to "pay the difference out of [his] personal funds" if the investment proceeds were insufficient to make investors whole.

6

21. On or about May 14, 2021, defendant GIRI failed to repay the promised principal funds to NBD Eidetic Capital's investors. NBD Eidetic Capital's investors complained to defendant GIRI and another employee of NBD Eidetic Capital, NBD EMPLOYEE-1. On or about May 24, 2021, NBD EMPLOYEE-1 told defendant GIRI: "I have just been telling people what you wanted. The sudden drop in price makes you have to protect the value of the fund which delays withdrawals. I do think we seriously need to get ahead of this this week or we are going to have serious problems with numerous people losing patience."

22. In response, defendant GIRI had NBD EMPLOYEE-1 send an email to NBD Eidetic Capital's investors on or about May 25, 2021, which sought to extend the investment contract term. As part of the email, defendant GIRI promised, "[d]ividends will be released as scheduled this Friday, May 28. Principle [sic] amounts will be released on June 7th. I will also be sending out an additional month of dividends along with principal on said date."

### Defendant GIRI Solicits New Investments to Pay Out Existing Investors

23. On or about May 28, 2021, defendant GIRI misappropriated funds provided by a new investor to pay "dividends" to the NBD Eidetic Capital investors. Specifically, on or about May 28, 2021, INVESTOR-4 sent an electronic bank transfer for $300,000 to the SR PRIVATE EQUITY ACCOUNT, relying on defendant GIRI's false representation that he would invest that money in cryptocurrency. Instead, later that same day, on or about May 28, 2021, defendant GIRI transferred that amount into the NBD EIDETIC CAPITAL ACCOUNT and caused it to be distributed, along with other funds, to at least 30 existing investors (including NBD Eidetic Capital investors).

24. Despite paying these "dividends," in or around June 2021, defendant GIRI continued to receive and respond to complaints from NBD Eidetic Capital investors, as well as others who invested separate from the fund. For example:

    a. On or about June 9, 2021, defendant GIRI sent the following text messages to NBD EMPLOYEE-1: "[C]an you talk to [an investor] and see if he can push the date by a week or something. I'm willing to pay a premium or get him a little more money from his investment. But I NEED more time."

    b. On or about June 17, 2021, NBD EMPLOYEE-1 told defendant GIRI: "[An investor] said the note is for 1,050,000. Is that because it was $800K and then 5% a month? I don't know 100% on this. I know it was said you would pay 5% but I don't know what's actually documented." Defendant GIRI responded, "Yes it was included in the note. F**king unbelievable man. Literally skinning me. Talk about taking advantage of me. . . . It's fine, I agreeed [sic] to it. But the terms are f**king stupid. Where else is he going to get 5% monthly. Get the f**k out." Later that day, defendant GIRI told NBD EMPLOYEE-1 that the "[investor]'s lawyer thinks this is a Ponzi scheme. Lol."

25. During this same time period, defendant GIRI continued to solicit new investors using false representations as to his success as a cryptocurrency trader, his ability to generate investment returns, and his ability to guarantee investor principal. For example:

    a. On or about June 8, 2021, defendant GIRI sent the following text message to INVESTOR-5: "I also give my friends a promissory note. You will be guaranteed your principal back at the end of the trading term no matter what. Just so you feel comfortable doing this!" On or about June 22, 2021, and June 24, 2021, INVESTOR-5 sent three electronic bank transfers totaling approximately $75,000 to the SR

PRIVATE EQUITY ACCOUNT so that defendant GIRI could invest that money in cryptocurrency.

b. On or about June 20, 2021, defendant GIRI also encouraged INVESTOR-5 to recruit other investors. Defendant GIRI sent INVESTOR-5 the following text: "Side note, [INVESTOR-6] that is liquid (200k?), what are the chances he will want in asap? We're getting a few more deposits tomorrow and I'm trying to plan. I think we might break 28k early this week before a major bounce. So also a fantastic time to get in." When asked about the likely rates of return, defendant GIRI responded, "I'd say conservatively a 2x over 6 months . . . Let me know if you need me to hop on a call with you to close the deal . . . ." One week later, on or about June 28, 2021, defendant GIRI sent another text message to INVESTOR-5 asking about INVESTOR-6: "[INVESTOR-6] is the one who has like 200k liquid right? What are the chances you get him to come in with 100k to start since it's guaranteed principal back?!" In conversations with INVESTOR-6, GIRI represented himself to be a successful cryptocurrency trader. On or about June 28, 2021, INVESTOR-6 sent an electronic transfer of $50,000 to the SR PRIVATE EQUITY ACCOUNT so that defendant GIRI could invest that money in cryptocurrency.

c. On or around June 11 and 12, 2021, defendant GIRI attended a real estate conference in Cabo San Lucas, Mexico, during which he gave a presentation on cryptocurrency. Following this presentation, defendant GIRI solicited participants to invest in his cryptocurrency investment fund, by promising investors that they would receive their money back within a 60-day period (to come due in late August 2021), their principal guaranteed, and specified interest of 15 to 20 percent. Many of these investors were

9

provided promissory notes from SR Private Equity, which were signed by defendant GIRI.

26. With the obligation to repay NBD Eidetic Capital investors still outstanding, defendant GIRI continued throughout the summer to repay old investors with money raised from new investors. For example, on or about July 8, 2021, defendant GIRI received an electronic bank transfer of $50,000 from an investor into the SR PRIVATE EQUITY ACCOUNT. Prior to receiving these funds, the bank account had a balance of $500. Several days later, on or about July 15, 2021, defendant GIRI transferred $21,000 from the SR PRIVATE EQUITY ACCOUNT into the NBD EIDETIC CAPITAL ACCOUNT, and texted NBD EMPLOYEE-1: "21k is in the account for folks the 5% is going to." On or about July 16, 2021, eight investors were repaid a total of $20,550.

27. In or around August 2021, defendant GIRI traveled to California with INVESTOR-5 and encouraged INVESTOR-5 to organize a meeting with INVESTOR-7. In that meeting, defendant GIRI made false representations as to his success as a cryptocurrency trader, as well as about his ability to offer INVESTOR-7 a risk-free investment with guaranteed principal and a five percent rate of return (both of which could be demanded after the expiration of a 30-day term). In a text message sent after that meeting, defendant GIRI reiterated that INVESTOR-7 would receive an "absolute minimum" of between five and seven percent interest monthly, and represented that such interest was "typical[]." Defendant GIRI further stated that he would attempt to generate 10 to 20 percent interest for INVESTOR-7 within five days to showcase defendant GIRI's investment skills.

28. On the basis of defendant GIRI's representations, on or about August 31, 2021, INVESTOR-7 made an initial investment with defendant GIRI by sending an electronic bank

transfer of $50,000 to the SR PRIVATE EQUITY ACCOUNT.

29. On or about September 3, 2021, defendant GIRI told INVESTOR-7 that the investment had already appreciated by 26 percent. Defendant GIRI represented that INVESTOR-7 could either cash out the investment or roll it over into a second investment on similar conditions as the initial investment, except that the specified investment period would be three to six months. Believing that the initial investment had already appreciated significantly, on or about September 7, 2021, INVESTOR-7 agreed to roll over the principal and the accumulated interest, and sent a second investment of $50,000 via electronic bank transfer to the SR PRIVATE EQUITY ACCOUNT.

30. In the fall of 2021, INVESTOR-7 made two additional investments totaling $350,000 with defendant GIRI. To make these two investments, INVESTOR-7 created and funded an account on a cryptocurrency exchange, to which defendant GIRI was given limited access for the purpose of trading cryptocurrency on INVESTOR-7's behalf.

31. On or about December 20, 2021, defendant GIRI transferred 2.42 Bitcoin (approximately $112,378 as of that date) from INVESTOR-7's account on the cryptocurrency exchange to another account on a different cryptocurrency exchange in the name of defendant GIRI's father. Later that day, on or about December 20, 2021, defendant GIRI used 1.21 Bitcoin (approximately $58,597 as of that date) of those funds to repay a prior investor.

### Defendant GIRI Lies When Investors Demand Return of Funds

32. When certain investors demanded repayment of the promised investment amounts, defendant GIRI made various false or misleading representations about the reasons he could not repay these investors until some later time, including, but not limited to, claims that repayment was delayed because of freezes placed on his bank and/or cryptocurrency accounts.

33. On or about November 8, 2021, defendant GIRI sent certain investors screenshots of alleged pending wire transfers into the investors' bank accounts, which were never actually received. For example, defendant GIRI sent (through an intermediary) one investor a document titled "Wire Transfer Details," which purported to show confirmation of a $40,000 wire payment made from SR Private Equity LLC to the investor's personal bank account. In reality, no such payment was ever made.

### Defendant GIRI Attempts to Recruit New Investors Using the Same False Representations

34. Defendant GIRI continued to solicit new investors using the same false representations through at least in or around July 2022. Specifically, in or around July 2022, defendant GIRI was introduced to a potential investor who, unknown to defendant GIRI, was an undercover law enforcement agent (the "Undercover Agent"). Despite defendant GIRI's knowledge at this time that he had failed repeatedly to honor the terms of his prior investment agreements with numerous investors (many of whom were still owed their guaranteed principal and promised interest), during a meeting on or about July 24, 2022, defendant GIRI told the Undercover Agent, "[Y]ou're going to be guaranteed your principal back no matter what with whatever term we have."

35. On or about July 24, 2022, defendant GIRI falsely represented to the Undercover Agent that the Undercover Agent's funds would be pooled with other investors and that profits above five percent would be shared between defendant GIRI and the pooled investors.

36. Three days later, on or about July 27, 2022, defendant GIRI sent the following text message to the individual through whom he met the Undercover Agent:

> Defendant GIRI: He wants a breakdown of the "pool" and equity he would have. So I'm making an excel sheet to send him lol

12

| | |
|---|---|
| [Individual]: | Oh nice [emojis] how's that work? |
| Defendant GIRI: | Literally have to make up 5 other people and makeshift %. It doesn't really mean anything, he just wants to know for some reason. |

37. The following day, on or about July 28, 2022, the Undercover Agent received a spreadsheet from defendant GIRI purporting to list six investors with their respective contributions to the pool, including the Undercover Agent's assumed name.

## COUNTS ONE THROUGH FIVE

### (Wire Fraud, 18 U.S.C. § 1343)

The Grand Jury Further Charges That:

38. Paragraphs 1 through 37 of this Indictment are hereby realleged and incorporated by reference as though fully set forth herein.

39. Beginning in or around August 2020 and continuing until in or about July 2022, the exact dates being unknown to the Grand Jury, in the Southern District of Ohio and elsewhere, the defendant, **RATHNAKISHORE GIRI**, did knowingly and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, omissions, and knowing concealment concerning a material fact or matter, transmit or cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, including the specific wire payments and transfers transmitted on or about the dates listed in the table below, each corresponding to a separate count of this Indictment:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| ONE | August 11, 2020 | Wire from INVESTOR-1 to the GIRI PERSONAL ACCOUNT |
| TWO | October 6, 2020 | Wire from INVESTOR-2 to the GIRI PERSONAL ACCOUNT |
| THREE | May 28, 2021 | Wire from INVESTOR-4 to the SR PRIVATE EQUITY ACCOUNT |
| FOUR | June 28, 2021 | Wire from INVESTOR-6 to the SR PRIVATE EQUITY ACCOUNT |
| FIVE | August 31, 2021 | Wire from INVESTOR-7 to the SR PRIVATE EQUITY ACCOUNT |

All in violation of Title 18, United States Code, Section 1343.

## FORFEITURE ALLEGATIONS

The Grand Jury Further Charges That:

Upon conviction of any offense set forth in this Indictment, the defendant, **RATHNAKISHORE GIRI**, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

If any of the property described above, as a result of any act or omission of the defendant:

1. cannot be located upon the exercise of due diligence;
2. has been transferred or sold to, or deposited with, a third person;
3. has been placed beyond the jurisdiction of the Court;
4. has been substantially diminished in value; or
5. has been commingled with other property which cannot be divided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461(c).

A TRUE BILL.

s/Foreperson
FOREPERSON

UNITED STATES OF AMERICA

GLENN S. LEON
Chief, Fraud Section

By: _____
LUCY B. JENNINGS
TAMARA LIVSHIZ
Trial Attorneys
Fraud Section
U.S. Department of Justice